UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

SHELIA M. SOUTHERLAND,

     Plaintiff,

v.                                                          Case No. 5:15cv96-CJK

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

     Defendant.

_____/

<u>MEMORANDUM ORDER</u>

This case is before the court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of Social Security ("Commissioner") denying Shelia M. Southerland's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34, and Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. §§ 1381-33.  The parties consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73 for all proceedings in this case, including entry of final judgment.  Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner, therefore, will be affirmed and the applications for DIB and SSI denied.

## ISSUES ON REVIEW

Ms. Southerland, who will be referred to as claimant, plaintiff, or by name, raises three issues.  She claims the Administrative Law Judge ("ALJ") erred by: (1) rejecting treating physician Dr. Hutchinson's opinion and failing to properly account for either claimant's acute injuries or the persisting lymphedema and pain in the residual functional capacity ("RFC") determination; (2) arriving at a mental residual functional capacity determination that is unexplained and unsupported by substantial evidence; and (3) finding claimant not credible.  (Doc. 20, p. 1-2).

## PROCEDURAL HISTORY

On May 3, 2011, plaintiff protectively filed applications for DIB and SSI, alleging disability beginning April 20, 2011.  T. 212, 214.[1]  The Commissioner denied the applications initially and on reconsideration.  T. 90, 101, 112, 124.  Claimant appeared before the ALJ for a hearing on April 25, 2013.  T. 62.  After the hearing, the ALJ found claimant not disabled under the Act.  T. 39-53.  The Appeals Council denied claimant's request for further review and, as a result, the ALJ's decision became the final determination of the Commissioner.  T. 1-3.  That determination is now before the court for review.

---

[1] The administrative record, as filed by the Commissioner, consists of twelve volumes (docs. 14-2 through 14-13), and has 680 consecutively numbered pages.  References to the record will be by "T.," for transcript, followed by the page number.

Case No. 5:15cv96-CJK

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

• Claimant has not engaged in substantial gainful activity since April 20, 2011, the alleged onset date.  T. 41.

• Claimant has the following severe impairments: history of neck fracture at C2, status-post halo placement and fixation; osteoarthritis of the right shoulder with tear; open reduction internal fixation of the left leg, status-post surgery; depression; post-traumatic stress disorder; hypothyroidism; panic disorder without agoraphobia; intermittent explosive disorder; and obesity.  T. 41.

• Claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except she can lift, carry, push, and/or pull 10 pounds frequently and occasionally; she cannot climb ladders, ropes, and scaffolds, but can climb ramps and stairs; she is limited to occasional balancing, crawling, kneeling, crouching, and stooping; she can tolerate no more than occasional exposure to hazards such as heights and machinery; she has no manipulative limitations retaining the ability to reach, handle, finger, and feel; she is able to sit 30 minutes before standing to relieve any discomfort; she is able to stand 5-30 minutes before having to sit and rest; she is able to walk 10 minutes before

having to stop; she can interact with co-workers and supervisors but only through occasional conversations and interpersonal interactions; she can interact with the public but should not engage in extensive transactions or negotiations; and she should be in a low stress environment defined as few changes in her work environment.  T. 45.

- • Claimant is unable to perform any past relevant work.  T. 51.

- • Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform.  T. 52.

- • Claimant has not been under a disability, as defined in the Act, from April 20, 2011, through September 6, 2013.  T. 53.

### STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards."  *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)).  A reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir.

1983).  Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[2]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, she is not disabled.

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).
Case No. 5:15cv96-CJK

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from performing her past relevant work, she is not disabled.[3]

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, she is not disabled.

Step five (or step four in cases where the ALJ decides a claimant can perform her past work) is where the rubber meets the road.  At that point, the ALJ formulates the all-important residual functional capacity.  Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity.  The ALJ establishes residual functional

---

[3] Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five. "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

FACT BACKGROUND AND MEDICAL HISTORY[4]

Ms. Southerland was born November 10, 1971, making her less than 50 years old at the time of the ALJ's decision. T. 91. She has a general equivalency diploma with past work as a bartender, cook/waitress, delivery driver/warehouse employee, dog bather, and housekeeper. T. 67, 235. She worked most recently as a cook in 2012. T. 71-72. Plaintiff claims disability due to a combination of what she finds to be debilitating physical and mental impairments. T. 91, 102.

---

[4] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record. The facts below, where not derived from the medical records, are based largely, if not entirely, on plaintiff's testimony in that regard. Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

Case No. 5:15cv96-CJK

<u>Physical Impairments</u>

Ms. Southerland was involved in a motor vehicle accident on April 20, 2011, and, as a result of her injuries, was hospitalized at Tallahassee Memorial Hospital until May 12, 2011.  T. 295-97.  She suffered a C2 (cervical) fracture[5] and an open left femur fracture, among other injuries.  T. 295.  Her treatment included a halo brace for the C2 fracture and internal fixation of the complex femur fracture.  T. 295-96.

A.    Left Femur Fracture

On April 20, 2011, Hank Hutchinson, M.D., operated on claimant's left leg, performing a "retrograde intramedullary nail fixation" of the femur.  T. 339.  From May 18, 2011, through March 6, 2012, Dr. Hutchinson followed claimant during the recovery of the femur fracture.  T. 323-32, 425-30.  Ms. Southerland reported swelling shortly after the surgery; Dr. Hutchinson advised swelling was normal after

---

[5] "A cervical fracture means that a bone is broken in the cervical (neck) region of the spine. . . . Cervical fractures and dislocations are typically classified according to their region/location and injury/fracture pattern."  *Cervical Spine Fractures & Dislocations*, University of Southern California (last visited Aug. 2, 2016), available at http://www.uscspine.com/conditions/neck-fractures.cfm.  "The upper cervical spine (occiput, C1 and C2) is a functionally distinct unit compared to the lower cervical spine (C3-C-7) as it is designed for rotary movement.  Fractures involving C1 and C2 are generally considered anatomically unstable due to their location and paucity of supporting ligaments."  *Classification of Cervical Spine Injuries*, EB Medicine (last visited Aug. 2, 2016), available at https://www.ebmedicine.net/topics.php?paction=showTopicSeg&topic_id=189&seg_id=3911.

a traumatic wound and encouraged her to elevate her leg to reduce swelling.   T. 327.

In July 2011, plaintiff reported she was "doing well."   T. 323.

In a Medical Source Statement of Ability to Do Work-Related Activities completed on August 18, 2011, four months post-accident, Dr. Hutchinson indicated claimant could frequently lift and/or carry ten pounds.   T. 414.   The doctor also indicated claimant was limited to standing and/or walking less than two hours in an eight-hour workday and required a hand-held assistive device for ambulation.   T. 414.

In October 2011, Dr. Hutchinson noted the femur fracture was completely healed and claimant could return to work.   T. 429.   Ms. Southerland reported episodic leg swelling in February 2012.   T. 427.   Dr. Hutchinson advised claimant she "may have on again and off again swelling potentially for her whole life due to the severe nature of the soft tissue injury to her left leg[.]"   T. 427.   The doctor suggested wearing compression stockings or Ace wraps to prevent swelling and indicated monitoring for "Deep Vein Thrombosis" would be necessary if the swelling got worse.   T. 427.   Hutchinson concluded he could provide no further treatment.   T. 427.   At their last meeting in March 2012, Dr. Hutchinson reiterated that the femur fracture was completely healed and he could provide no further

treatment. T. 425. He noted, however, that he wanted to refer plaintiff to a vascular surgeon to evaluate her persistent left leg swelling. T. 425.

In September 2011, Edmond Molis, M.D., reviewed claimant's medical records as part of the disability application process. T. 119-20. Dr. Molis noted claimant was "currently wearing a surgical halo and cannot lift anything" and she had limited movement in her broken left leg. T. 120. He predicted, however, that by April 2012, plaintiff would be able to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. T. 119-20.

Ms. Southerland sought treatment from Patrick Tamim, M.D., a vascular surgeon, from April 9, 2012, to June, 27, 2012. T. 442-52. At the initial examination, Ms. Southerland reported severe and painful swelling of both legs, with the left worse than the right. T. 446. Upon physical examination, Dr. Tamim confirmed "bilateral 3+ pitting edema." T. 447. He diagnosed lymphedema and noted the swelling was "very likely due to the trauma—possibly from lymphatic disruption." T. 447. Dr. Tamim initially decided to treat the swelling with graded compression stockings. T. 447. He later performed an iliac vein stenting procedure. T. 442. After the procedure, claimant's left leg swelling "improved greatly," and she reported "feeling well." T. 442.

B.     C2 Fracture

Ms. Southerland visited the Tallahassee Neurological Clinic for follow-up treatment of her C2 fracture from May 2011 through December 2011.  T. 347-64, 420-24.  The C2 fracture was treated with a halo vest from April 22, 2011, until July 21, 2011.  T. 347, 353.  Dr. Christopher Rumana reported steady recovery during eight months of treatment.  T. 347-64, 420-24.  Ms. Southerland complained of some neck pain and stiffness, but denied any limitations in her arms or legs.  T. 347, 358, 361.  In August 2011, Dr. Rumana noted claimant could, from a neurosurgical standpoint, resume all previous activities without restrictions.  T. 351.  Dr. Rumana also recommended physical therapy and home neck exercises.  T. 351.  In December 2011, plaintiff said she could not afford physical therapy, made no mention of exercises, and reported continuing neck pain that intermittently radiated down the right arm.  T. 420.

On July 19, 2011, Ayman T. Aboulela, M.D., examined Ms. Southerland at the request of the Commissioner.  T. 313-20.  Dr. Aboulela's "review of systems" was "unremarkable."  T. 314.  Dr. Aboulela concluded claimant could not walk more than 10 minutes or stand more than 30 minutes, but her work-related mental activity was normal.  T. 313.  The doctor noted claimant could not freely move her neck or

left knee.  T. 316.  Dr. Aboulela also found plaintiff could comprehend and follow directions.  T. 317.

<u>Mental Impairments</u>

Beginning in 2010, Ms. Southerland sought treatment for mental issues at Life Management Center.  T. 573-670.  Before the April 2011 auto accident, she was diagnosed with "Posttraumatic Stress Disorder," "Mood Disorder," "Panic Disorder without Agoraphobia," "Attention Deficit Hyperactivity Disorder," and "Intermittent Explosive Disorder."  T. 573-603.  In August 2011, claimant reported mild depression due to limited mobility and unemployment.  T. 613.  She also reported nightmares, flashbacks, and "hypervigilance," but stated "they are all stable and no better or worse."  T. 613.  During her time at Life Management Center, Ms. Southerland's prescriptions included Buspar, Clonidine, Prozac, and Remeron.  T. 573-670.

Licensed Mental Health Counselor ("LHMC") Anita DeSonia served as Ms. Southerland's primary contact at Life Management Center.  T. 573-78, 584-95, 598-611, 617-32.  On March 28, 2013, Ms. DeSonia completed a Mental Residual Functional Capacity Evaluation form.  T. 269-71.  The form indicated claimant would have moderate limitations in (1) maintaining attention and concentration for extended periods of time; (2) responding appropriately to work pressures in a usual

work setting; and (3) performing activities within schedule, at a consistent pace, and be punctual within customary tolerances. T. 269-70. The form also indicated claimant would have extreme limitations on the ability to complete a normal work day/week and perform at a consistent pace without an unreasonable number of unreasonably long rest periods. T. 270. Ms. DeSonia supported these conclusions by noting plaintiff's pain caused difficulties with focus, concentration, and movement. T. 269-71.

Paul Tritsos, Psy.D., evaluated Ms. Southerland in July 2011 at the Commissioner's request. T. 309-11. Claimant reported depression with symptoms of poor motivation, irritability, and poor concentration after her accident. T. 309. Dr. Tritsos diagnosed "Post-traumatic Stress Disorder, Chronic" and "Adjustment Disorder with Depressed Mood." T. 310. Dr. Tritsos concluded, from a mental health perspective, plaintiff was "able to handle activities of daily living/hygiene," had "adequate social comfort level/skill," and "experienced trouble with concentration, but appears to otherwise be able to maintain adequate cognitive ability." T. 311. Dr. Tritsos noted claimant's depressive issues are likely to be ongoing but treatment appeared helpful and should be continued. T. 311.

Non-examining psychologist Sanford Golin, Ph.D., concluded Ms. Southerland's mental impairments were non-severe in July 2011. T. 95. In

September 2011, non-examining psychologist Jorge Pena, Ph.D., also concluded the mental impairments were non-severe.  T. 117-18.

Julian Salinas, Ph.D., evaluated Ms. Southerland in June 2013 at the Commissioner's request.   T. 673-80.   Dr. Salinas diagnosed plaintiff with "Depressive Disorder, NOS" and "Anxiety Disorder, NOS."  T. 676.  Dr. Salinas noted claimant would have "moderate"[6] limitations in her ability to interact with the public, supervisors, and co-workers, and she would have a moderate limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting.  T. 679.  Dr. Salinas also concluded claimant had no limitations in understanding or carrying out simple instructions, but had mild limitations in understanding or carrying out complex instructions.  T. 678.

## ANALYSIS

Ms. Southerland claims the ALJ erred by: (1) rejecting Dr. Hutchinson's opinion and failing to properly account for either claimant's acute injuries or the persisting lymphedema and pain in the RFC determination; (2) arriving at a mental RFC determination that is unexplained and unsupported by substantial evidence; and (3) finding claimant not credible.  (Doc. 20, p. 1-2).

---

[6] On the Medical Source Statement, the term "moderate" indicates "there is more than a slight limitation in this area, but the individual is still able to function satisfactorily."  T. 678.
Case No. 5:15cv96-CJK

<u>Dr. Hutchinson & Physical RFC</u>

Claimant argues the ALJ improperly rejected the opinion of her treating physician, Dr. Hutchinson.  (Doc. 20, p. 22).  When a treating physician's opinion regarding claimant's condition is bolstered by medically acceptable clinical techniques, and is consistent with the other evidence in the record, the ALJ must give it controlling weight.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ, however, is not bound by a treating physician's opinion when "good cause" exists for rejecting it.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* at 1241.  An ALJ must consider numerous factors when evaluating a doctor's opinion, including whether the doctor examined the claimant, whether the doctor treated the claimant, the evidence the doctor presents to support his or her opinion, whether the doctor's opinion is consistent with the record as a whole, and the doctor's specialty.  *See* 20 C.F.R. §§ 404. 1527(c), 416.927(c).  "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons."  *Phillips*, 357 F.3d at 1241.  Failure to do so is reversible error.  *See Lewis*

*v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).

The ALJ afforded "less than significant weight" to Dr. Hutchinson's Medical Source Statement "because of the assessment's inconsistency with the overall evidence received at the hearing level (particularly the amount of days the claimant would be expected to miss work)." T. 51. Claimant maintains Dr. Hutchinson's opinion was not inconsistent with the record because at the time the form was completed, claimant had limited mobility in her neck due to the healing C2 fracture and required the assistance of a cane or walker due to the leg fracture. (Doc. 20, p. 22).

Plaintiff, however, overlooks the requirement that an applicant's impairment must be expected to last for a continuous period of at least 12 months. *See* 20 C.F.R. § 1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Dr. Hutchinson completed the Medical Source Statement on August 18, 2011, only four months after the motor vehicle accident and before claimant's left femur healed. T. 414-417. The statement specifically noted Ms. Southerland was limited to standing and walking less than two hours in an eight-hour workday because the femur was in the process of healing. T. 414. In October 2011, two months after completing the

statement, Dr. Hutchinson noted the femur was completely healed and, in his opinion, claimant could return to work.  T. 429.  Claimant, therefore, has not shown Dr. Hutchinson's opinion as to her status in August 2011 would be helpful to a disability determination under the controlling law.   Because the opinion is inconsistent with the record for the time relevant to this disability claim, the ALJ's decision to afford it less than significant weight is supported by substantial evidence.

Plaintiff also claims the opinions of Dr. Molis and Dr. Aboulela do not provide substantial evidence to support the ALJ's RFC determination.  (Doc. 20, p. 23-24).  The ALJ afforded "some weight" to Dr. Aboulela's opinion.  T. 48.  Plaintiff claims "Dr. Aboulela's opinion does not provide substantial evidence in support of the ALJ's RFC determination" because the opinion "is wholly inconsistent with the ability to perform substantial gainful activity until Ms. Southerland's factures were healed and the halo removed" and "is not relevant to the assessment of functional limitations in the subsequent period of time."  (Doc. 20, p. 23).  At the time of Dr. Aboulela's examination, plaintiff still used a cane for ambulation.   T. 315.  Nevertheless, Dr. Aboulela concluded claimant could walk up to 10 minutes and stand up to the 30 minutes.  T. 313.  These conclusions are consistent with the ALJ's determination that plaintiff "is able to stand 5-30 minutes before having to sit and rest" and "is able to walk 10 minutes before having to stop."  T. 45.  Dr. Aboulela's

opinion, therefore, provides some support for the ALJ's determination that plaintiff can perform a reduced range of sedentary work.

Claimant asserts Dr. Molis's opinion does not support the ALJ's RFC determination because it "is not only speculative, but also failed to account for any residual pain in the neck and shoulder, or the remaining post-surgical painful lymphedema." (Doc. 20, p. 23).  In September 2011, Dr. Molis predicted that by April 2012, plaintiff would be able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk 6 hours in an 8-hour work day, and sit 6 hours in an 8-hour work day.  T. 119.  The ALJ, however, afforded "less than significant weight" to Dr. Molis's opinion, finding plaintiff significantly more limited than Dr. Molis predicted.  T. 51.

Furthermore, the ALJ did not base the RFC determination solely on Dr. Molis's and Dr. Aboulela's opinions.  The ALJ explicitly noted he considered "the objective medical evidence of record, the claimant's subjective complaints, and the treatment required for the claimant's conditions" before concluding "the overwhelming evidence, in light of the undersigned['s] assessment of the claimant's credibility, supports her ability to perform a reduced range of sedentary work."  T. 51; s*ee Phillips*, 357 F.3d at 1238 ("Moreover, the ALJ will 'assess and make a finding about [the claimant's] residual functional capacity based on all the relevant

medical and other evidence' in the case.") (*quoting* 20 C.F.R. § 404.1520(a)(4)(iii), (d)).   Of note, Dr. Hutchinson concluded claimant's femur fracture completely healed and she could return to work in October 2011.   T. 429.   Likewise, the doctor treating the C2 fracture found that "from a neurosurgical standpoint [claimant] is free to resume all previous activities without restrictions" in August 2011.   T. 351.

Plaintiff also claims the ALJ's RFC assessment failed "to properly address [her] functional limitations after October 2011 due to her ongoing difficulty with lymphedema once the fracture had healed."   (Doc. 20, p. 24).   On April 9, 2012, Dr. Tamim observed "bilateral 3+ pitting edema" that was "very likely" due to the previous leg trauma.   T. 447.   His notes from June 27, 2012, however, indicate claimant's leg swelling "improved greatly" after an iliac vein stenting procedure and with the use of compression stockings.   T. 442.   After the procedure, Dr. Tamim noted "bilateral 1+ pitting edema," and that claimant was "feeling well."   T. 442-43. Also, following the procedure, the majority of claimant's visits to her primary care physician, Roger J. Gamad, M.D., do not reflect complaints about lymphedema.   T. 552, 554-557.   Because the objective evidence of lymphedema is relatively benign after the vein stenting, the assessment of the functional limitations resulting from the condition hinges largely on plaintiff's subjective complaints of pain.   As will be discussed below, the ALJ did not err by finding those complaints not entirely

credible.  The ALJ's physical RFC assessment, which limited plaintiff to a reduced range of sedentary work, is supported by substantial evidence.

<u>Mental RFC</u>

Plaintiff contends the ALJ's assessment of her mental RFC is unexplained and not supported by substantial evidence.  (Doc. 20, p. 25-26).  Specifically, claimant asserts the ALJ erred in affording Ms. DeSonia's opinion less than significant weight, and affording Dr. Salinas' and Dr. Tritsos' opinions some weight.  (Doc. 20, p. 26).

The ALJ assigned "less than significant weight" to Ms. DeSonia's Mental Residual Functional Capacity Evaluation form "because of the assessment's inconsistency with the overall evidence received at the hearing level."  T. 51.  Plaintiff asserts the opinion should have been afforded more weight because DeSonia saw plaintiff in 24 counseling sessions, had access to all of plaintiff's mental health records, and could provide a longitudinal perspective of plaintiff's condition.  (Doc. 20, p. 27-28).

As an LHMC, DeSonia is not considered an "acceptable medical source."  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a); *cf. Miles v. Soc. Sec. Admin., Comm'r*, 469 F. App'x 743, 745 (11th Cir. 2012) ("[A]n ALJ has no duty to give significant or controlling weight to a chiropractor's views because, for SSA purposes, a

chiropractor is not a 'medical source' who can offer medical opinions."). Such an opinion, however, may be used to show the severity of claimant's impairments and is evaluated in the same manner as an "acceptable medical source." *See* 20 C.F.R. § 404.1513(d); *see* SSR 06-03P 2006 WL 2329939 at *4-5 (noting factors used to evaluate opinions of "acceptable medical sources" apply to opinions from "other sources"). As explained below, the ALJ had good cause to assign less than significant weight to DeSonia's opinion.

Although plaintiff indicates she saw Ms. DeSonia in 24 counseling sessions (doc. 20, p. 28), the last documented visit occurred on October 4, 2011. T. 631-32. DeSonia, however, completed the evaluation form on March 28, 2013, nearly a year and a half later. T. 269-71. The record, therefore, does not reflect that DeSonia had an ongoing relationship with plaintiff at the time the form was completed. In addition, although DeSonia is a mental health expert, she supported most of the conclusions found on the form by referencing claimant's pain. T. 269-71. Because DeSonia did not treat claimant's pain (or the underlying physical conditions causing the pain), her opinions would logically and legally be afforded less weight. *Cf.* 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2)(ii) ("For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but

we will give it less weight than that of another physician who has treated you for the neck pain.").

Ms. DeSonia's conclusions are also inconsistent with the observations of the treating physicians at Life Management Center.  T. 573-671.  These physicians reported claimant was doing "significantly better" and "ok," with mild depression and stable conditions.  T. 580, 613, 642, 649-55.  Significantly, on January 18, 2012, Dr. Hamm noted claimant stated "she's been 'ok' and feeling better since returning to work as a cook in a restaurant."  T. 647.  The inconsistency between DeSonia's evaluation form and the doctors' notes from Life Management Center also supports the ALJ's decision to afford the form less than significant weight.

Furthermore, the notes from Ms. DeSonia's counseling sessions do not mention any symptom or limitation produced by claimant's condition.  T. 573-78, 584-95, 598-611, 617-32.  Instead, the notes merely document DeSonia's treatment recommendations, which included activities such as "positive self talk," "redirect negative thinking," and "learn self soothing."  T. 574, 585, 587, 589, 591, 618, 620, 632.  The lack of detail in the notes does not bolster the conclusions offered on the Mental Residual Functional Capacity Evaluation form.  Because DeSonia's evaluation form was inconsistent with the overall record evidence and because she

is considered an "other source," the ALJ properly afforded the opinion less than significant weight.

Plaintiff also claims the opinions of Dr. Tritsos and Dr. Salinas do not provide substantial evidence to support the RFC assessment.  (Doc. 20, p. 28).  Both doctors' observations are supported by the evidence of record, which reflects claimant can complete certain social activities.  T. 309-12, 673-76.   Dr. Salinas found claimant may have some problems with social functioning and periods of diminished behavioral efficiency but was capable of managing her own funds.  T. 676.  Dr. Salinas noted plaintiff appeared at her appointment on time, drove herself, interacted appropriately with reception staff, and sat in the waiting area completing forms prior to her interview.  T. 675.  Dr. Tritsos found claimant capable of managing daily living and hygiene activities, had adequate social comfort level/skill, experienced trouble with concentration, but was able to maintain adequate cognitive ability.  T. 311.  When a non-medical source's conclusion is inconsistent with that of an "acceptable medial source," the ALJ may properly afford more weight to the acceptable medical source despite the non-medical source's frequent visits with the claimant.  *See Troutman v. Astrue*, No. 3:11cv89-WS-CJK, 2011 WL 6960818 at *8 (N.D. Fla. Dec. 5, 2011) (finding ALJ properly rejected nurse practitioner's opinion in part because it was inconsistent with the opinion of an examining physician),

*report and recommendation adopted by* 2012 WL 32585 (N.D. Fla. Jan. 6, 2012). The ALJ, therefore, did not err by affording Dr. Salinas's and Dr. Tritsos's opinions more weight than DeSonia's opinion because Desonia's opinion was inconsistent with the record and Salinas and Tritsos are considered "acceptable medical sources." The ALJ's mental RFC assessment, which was based on Drs. Tritsos's and Salinas's opinions, is supported by substantial evidence.

<u>Credibility Determination</u>

Plaintiff claims "the ALJ erred in finding Ms. Southerland's allegations of pain, edema, and limitations 'not entirely credible.'" (Doc. 20, p. 30). Although the ALJ acknowledged the record "supports some level of functional limitations related to the claimant's impairments," he found the record did "not support such significant limitations as alleged by the claimant." T. 46. The ALJ noted: (1) "[t]he objective medical evidence of record does not support the claimant's allegations regarding the intensity, persistence, and limiting effects of her symptoms"; (2) "claimant's pain is adequately controlled with prescribed medication"; and (3) claimant's subjective complaints are inconsistent with her activities of daily living.[7]  T. 47.  Plaintiff

---

[7] The ALJ summarized the basis for the credibility determination as follows:

> Inconsistent reports and testimony from the claimant and the fact that the record contains observations of generally stable findings, with some improvement in condition when compliant with conservative treatment, detract from the credibility of the claimant's allegations as to her functional limitations and the severity of her alleged symptoms.

asserts the reasons cited for discrediting her testimony are not supported by the record.  (Doc. 20, p. 30); *see Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) ("After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence.").

The objective medical evidence supports the ALJ's credibility determination. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.").  As claimant's treating physicians noted, the C2 and femur fractures healed and claimant could resume her previous activities.  T. 351, 429.  With respect to the lymphedema, Dr. Tamim reported claimant's leg swelling "improved greatly" and she was "feeling well" after the June 2012 iliac vein stenting. T. 442.  Tamim further noted plaintiff was "wearing her graded compression hose as recommended."  T. 442.  Moreover, following the stenting procedure, Dr. Gamad did not note any edema.  *Compare* T. 552, 554-57 *with* 559, 561.  Likewise, during a September 2012 visit to Bay Medical Center for a headache, an examining nurse found "no peripheral edema" and "[range of motion] intact for all extremities."  T. 547-48.  In sum, due to the healing of claimant's fractures and the successful

---

T. 50.

treatment of the lymphedema, substantial evidence supports the ALJ's conclusion that claimant's subjective complaints were not entirely substantiated by the objective medical evidence.

The ALJ also based the credibility determination on the inconsistency between claimant's subjective complaints and her activities of daily living.  Plaintiff argues that "[e]vidence of minor personal activities do not alone provide substantial evidence of the functional capacity necessary to engage in substantial gainful activity."  (Doc. 20, p. 32) (*quoting Rutledge v. Barnhart*, 391 F. Supp. 2d 1057, 1062 (N.D. Ala. 2005).  As the Commissioner correctly notes, however, the ALJ may consider a claimant's ability to perform activities of daily living as a factor when making the credibility determination.  *See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) ("The regulations do not . . . prevent the ALJ from considering daily activities at the fourth step of the sequential evaluation process."); *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("As a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain.").

Here, the ALJ noted claimant:

lives with a friend, and she is able to function adequately in a full range of routine activities of daily living with occasional and/or no assistance, which include: bathing herself, dressing herself, feeding herself, caring for her hair, dialing a telephone, shopping in stores, brushing her teeth,

using the toilet, preparing meals, completing light household chores, washing dishes, riding in a car, going to doctor's appointments, picking up medicine, visiting family, visiting friends, associating with family, associating with friends, spending time with others in person, watching television, listening to the radio, taking care of her dogs, going outside alone, and going outside daily.

T. 47.  Plaintiff claims the ALJ mischaracterized her ability to complete certain activities.  (Doc. 20, p. 32-33).  Upon consideration of the entire record, however, substantial evidence supports the ALJ's decision to discredit claimant's subjective complaints based in part on her activities of daily living.  For example, in July 2011, Dr. Tritsos noted Ms. Southerland reported "adequate ability to manage with activities of daily living, within her physical means at this time."  T. 309.  Dr. Tritsos also concluded, "[f]rom a mental health perspective, claimant appears able to handle activities of daily living/hygiene."  T. 311.  In June 2013, Dr. Salinas noted plaintiff presented on time for her appointment and drove herself.  T. 675.  He noted she "interacted appropriately with reception staff," "sat in the waiting area completing forms prior to her interview," and "was able to follow a simple sequence of directions to the examination room."  T. 675.  Claimant reported she "conducts basic self-care, and does housekeeping tasks 'when I can, when it's not hurting me real bad,' and cooks using the microwave.  She drives and she manages her own money."  T. 674.  Although Dr. Salinas noted claimant's "marginal grooming," he also noted she had good hygiene.  T. 675.

In short, both the lack of objective medical evidence and the claimant's ability to perform activities of daily living support the ALJ's credibility determination. The credibility determination, therefore, is supported by substantial evidence. *See Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) ("The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it.").

## CONCLUSION

The undersigned finds the Commissioner's residual functional capacity assessment is supported by substantial evidence and application of the proper legal standards. In addition, the Commissioner's credibility determination is supported by substantial evidence.

Accordingly, it is ORDERED:

1.     The decision of the Commissioner is AFFIRMED and plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income are DENIED.

2.     The clerk is directed to close the file.

DONE AND ORDERED this 23rd day of August, 2016.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

Case No. 5:15cv96-CJK